The next matter is Fogliav.Versus.Renal Ventures. Barry Muller, M-U-L-L-E-R, from Fox Rothschild, for the respondent, Renal Ventures. I'll be very brief. That's always, whenever anyone says that, it's time to look at your watch. You're never very brief. Either we're enormously grateful because you've kept your word, or we're extremely disappointed. All I'm going to say is that Judge Hillman reviewed this case twice, reviewed the complaint twice in detail, in depth. He evaluated the complaint under a 12b6 standard. I disagree with the notion that this is purely 9b. 9b doesn't have a dismissal remedy. It's 12b6, and for a False Claims Act claim, you have to show both plausibility and specificity. And Judge Hillman reviewed the complaint, the amended complaint, and the second amended complaint, and found on each occasion that there weren't plausible and specific facts sufficient to allege a viable FCA claim. Did the pleading requirements of 9b change with Quambly and Iqbal? If you know. Yeah, yeah. I don't know if it changed 9b. I think it changed the 12b. It certainly wouldn't have made the requirements any more lenient, any less. No, Judge Smith. That's safe to say. No, Your Honor. It would have increased the pleading requirement. Given the position you've taken, what additional allegations do you think should have been made here to pass Muster under 9b? Well, under 9b, there would have had to have been some specific allegations marrying up the alleged discrepancies in the log sheets to some sort of scheme or false claim. Under 9b, you have to come in either with your claim in hand or with facts, specific reliable facts sufficient to create a strong inference that there's been a false claim submitted. So that's the standard. How can you do that without discovery? If you look at Progress 55 through 60 of the complaint, I don't know what more they could have pled in this, more than the conclusionary allegations that the district court labeled it. It's 56. Well, dosage exemplar comes in vials that contain two MCG. I guess that's not milligrams. Was it micrograms? Micrograms, Your Honor. Only purchases and uses five micrograms. The defendant should be using 50 vials a day based upon that. Then says the inventory of log sheets maintained for this period show that 50 would be used if the defendants were following clinical guidelines for not using unused portions. Foglia believes the defendant in submitting claims for reimbursement for what they should be using as opposed to what they actually were using is so essential to billing, 50 vials that they actually were using only 29. You're basically saying they inflated the bill to get paid for vials that they weren't using. With no discovery on this claim as opposed to SEPA, what more could he possibly have pled? Then he gets down to 59 and continues with specificity. Well, Chief Judge, in our opinion, he shouldn't have brought the claim if he didn't have sufficient proper factual basis, and he clearly didn't. How do you get that? Go ahead. Your adversary cited to USX Ray Wilkins, and I was on the panel in that case. We said there that there's no requirement that a plaintiff, quote, identify a specific claim for payment at the pleading stage of the case, the state of claim for relief. That helps him, doesn't it? It does, Your Honor. He doesn't have to come in with an actual false claim. But, again, the standard as laid out, and I believe in Wilkins and Rodriguez and Judge Hillman articulated it, is even if you don't have a claim, you can come in with specific facts which are strong enough to raise a strong inference that there is a false claim. Well, isn't that in what I just read from paragraph 55, 56, and 57 of the complaint? Well, what he alleges is a discrepancy that he creates in this complaint, which doesn't actually exist in reality, and it doesn't actually exist in the complaint if you read it, and all the exhibits, because he's saying that we can't double dip, we can't use the unused portion of the exemplar, when he attaches as an exhibit to the complaint a memo from CMS that says that you can. So his whole assumption- Yeah, but he's not saying you can't use it. He's saying you can't bill for single use if you're reusing the vials. You can't use 15 vials and bill for 30 vials if you're taking the 15 vials, getting two treatments out of it, and then you send the bill to the government because your patient flow suggests that on single use, if you use 30 vials, you get reimbursed for 30 vials, but in reality, you're getting two doses of exemplar per vial, so you only are entitled to half of what you bill for. That's what he's alleging. Well, what he's saying is, and I think it's a general principle, you can't bill the government for more than what you use, and he's saying, well, they had to use 50, but they only used 30, so therefore they must be billing the government for 50, and that assumption is contradicted by his complaint in which CMS says you can bill for the unused portion of the vial. For instance, you have a 5-microgram vial. A patient is prescribed 3 micrograms. You use 3 on one patient, you have 2 left. You can dispense the other 2 to another patient. So therefore his assumption. But they can't send a bill to the government requesting money for another vial that you use. Correct. But they never used in the first place. Correct. But his assumption here is that we had to use 50, and that's patently wrong and patently contradicted by his complaint, and that's what Judge Hillman found. Judge Hillman noted that in both decisions, that he's saying you can't double dip, yet the complaint alleges you can. Of course, he'd like to see if they are patently contradicted by your records, by your billing records, which discovery could answer that. Very easily resolved. But it hadn't been resolved before today. It really could have been before trial. Your Honor, I would liken this to a situation where I go to a doctor's office, and I'm the last person in, and I'm patient number 50 for that day, and I look on the sheet, and I'm number 50, and I see that there were 10 cancellations. So 40 people didn't show up. Under this theory Mr. Foglia has, I could file a false claim and say, aha, you had 50 patients you were scheduled to see. I know only 40 showed up. You must have been billing the government for 50. I mean, there's no, as Judge Smith said, there's nothing marrying up the log sheets with an actual scheme or an actual false claim here. It's pure conjecture. How would you marry it up? Let's assume that what he's alleging happened, and let's assume that all he knows, all he can get his hands on, absent the discovery, is the log sheet. How do you put a complaint together within the confines of Wilkins and Burlington Coat that does to get past a Rule 9 dismissal or a 12B dismissal? Sure, Chief Judge. What he could allege is if he doesn't have the claim, maybe he had a conversation or an email from a person out in Colorado who did the billing. He could allege hearsay, for example. He could allege hearsay. He could allege. Nobody told me. I think he has to be a little more specific under 9B. He would have to state the date, time, place, and identity of the speaker, but he could say that so-and-so out in Colorado told me that despite what we have on the log sheets, we routinely bill the government for this. He could have communications with someone in the facility describing the billing procedure. There are many ways in which he could have done this had he had actual knowledge that there was a false claim. But, unfortunately, this was a disgruntled employee who never complained about this and who was fired and decides to take a pound of flesh from Renal Ventures and file this False Claims Act claim when he had no facts to support it. That's not a rare scenario in these sorts of cases. I understand, Judge. That's what brings these claims. If it's a happy, fat, and contented employee who's being treated very, very well by a company that's part of the government, they're not going to kill the goose that's laying the golden egg. It's only when something happens to interrupt the relationship that the employee comes forward. And I would note that the case law is legion that says you can't use the FCA claim as a fishing expedition. You can't allege broad and conclusive allegations and then hope to find the specificity or the support for it in the defendant's discovery. And that's what happened here. He filed three complaints. He didn't have specificity or plausibility. He responded to initial disclosures, no specificity or plausibility. And then he responded to discovery, which wasn't limited to the SEPA claim. It was limited to all of the causes of action in the case. And he still had nothing. And at that point, we decided this claim had no merit. It wasn't viable. Did he get the billing records in discovery? They didn't get billing records for exemplar. No, they didn't get the billing records. They got staffing records. There were other pieces of their False Claims Act claim that they're not on appeal. So in terms of count one that's before us, you're saying he got everything in discovery except that which he would have had gotten to put together a more specific complaint. He didn't get any exemplar discovery. Well, he actually did get exemplar discovery. He got exemplar discovery regarding our policies and procedures. And he was the charge nurse who was in charge of dispensing the exemplar. So if one of the six conditions that the CDC set forth, which said this is the conditions you can double dip, for instance, the refrigerator is not a certain degree or they didn't dispense it within four hours, this is the man who would know because he's the one who's dispensing it. He's not the biller. He wouldn't know what you're billing the government for. No, but their other allegation here is that we couldn't double dip because we didn't comply with these six conditions that the CDC set forth. And Judge Hillman accurately said those aren't expressed conditions of payment. But even if you believe his argument that they are, he was the person who would be able to tell you specifically that on this day, Mrs. Jones received a double dip of this vial more than four hours after it was initially drawn. I mean, so he would have specific knowledge as to that. That would at least have put him in a better position to argue that, but he didn't. The only thing he did in the second amended complaint is he took some specific provisions of FERA and beefed up some regulatory provisions, but no more facts. So he didn't have any facts in any of the complaints. The only facts that he can hope to get to support his claim would come from us, and that's an inappropriate argument. That is exactly his argument. He's relying upon Wilkins to make it. He's saying, look, you've got me trapped here. You're using 9B to shield what we call in Burlington the sophisticated defrauder. I'm not suggesting you are or that that happened here, but that's what he's arguing. These are scurrious and criminal allegations. You have to come to the courthouse with something more than bare, conclusory allegations before you— But you just said yourself what you'd have to come to the court with can only come from you. No, that's not. It could come from, like I said, if he had communications or e-mails or almost what Judge Smith says, hearsay communications with other employees where they admitted that there was some practice to build a government for more that was being used. There's a whole host of things that he could have come to court with besides the actual claim in hand. The policies that you mentioned, does the policy allow for multiple use of vials? It allowed for the multiple use of vials consistent with the CDC recommendations, and that was the law at the time, and that was the CMS regulation, which said that you could double dip. And there's a whole host of reasons why there might be a discrepancy in what was used and what's on the log. These are end-stage renal disease patients. A lot of them have to go to the hospital, and they get dialysis there because they have other conditions. Some of them come an hour or two late, believe it or not, and they're only getting an hour of dialysis when they're prescribed three hours. So then you have to reduce the amount of Zemplar you give them. He hasn't played around any of those other possibilities. I mean, this is pure conjecture. There's numerous possibilities why the log sheets might differ from the prescription, and none of them lead to a strong inference that there was any false claims submitted. I don't have anything else unless Your Honors have any questions. Well, Jamar, while you were not brief, I think we were complicit in that lack of brevity. Okay. Thank you very much. He makes some very good arguments. Well, not surprisingly, he made those arguments. Every defendant makes those arguments in every single False Claims Act case. Well, use the example of the medical office. If I go to my doctor and I see that I'm the 10th person, I would hope that my doctor doesn't have 50 people booked, or I'd find another doctor. But let's assume I go in there, I'm the 10th patient, and I look and there have been five cancellations. Given your theory, why wouldn't I consider following the False Claims Act? Doctors have got to be billing for all 10, right? Judge McKee, your question leads me to where I wanted to start, so it's perfect. This is not a case where there were 10 no-shows. This is not a case where a patient sees that there were 50 people scheduled but only 40 showed up. My client has personal knowledge of the fact that they could not have, or should not have, double-dipped those vials because they were not, and he's alleged this, they were not in compliance with a single one of the requirements that were required by the government to allow a double-dip to avoid a serious health risk to the general public. What is the source of information your client has as to what was billed? Forget the health risk for a second. Just focus on the billing, as to what was billed to the government. He would never, just like in a pharmaceutical case with the right hand, the left hand is the central office. All we have there, Judge, is the circumstantial evidence of the fact that they order the vials, they know they're ordering the vials, and that they bill Medicare. And the other aspect of it, Judge, is that when you bill Medicare, when you bill Medicare, though you're billing per vial, it's in relation to the Medicare recipient's number. It's in relation to this chart. So in dealing with circumstantial evidence, and again, Judge, this is at the pleading stage, and we have not had any opportunity to do discovery in this. Mr. Mueller's point, and frankly he's got my, it's bustling in what little brain I have left, it's a good argument, is that how do we create, how do we avoid a scenario where every time someone has some suspicion that there may be, he's arguing, correct me if I'm wrong, Mr. Mueller, he's saying, look, there's an, you're arguing there's an opportunity for fraud here, therefore infer the fraud. No, I'm arguing there's fraud here. And I'm arguing based on the evidence, including circumstantial evidence, paragraph 32 through, I think, probably 48, and the paragraphs you mentioned during my adversary's argument. That takes the opportunity. I mean, you clearly plead an opportunity for fraud. Well, Judge, I think it's more than an opportunity because they bill by the patient. And to presume that they reduced a patient's bill by the fact that they got free Zemplar because the government already paid for the vial, when there's no records kept for the billing office to ever learn how much was used for which patient, it's an impossibility. It's an impossibility that they didn't bill for this. Why is it an impossibility? It's an impossibility. You're saying they couldn't possibly be honest. No, I'm saying no. I'm saying they could not possibly act against their own interests. Same thing. Because by being honest, they're operating against their own. Well, they may not view it that way. And I'm ignoring all the things about scurrilous complaints, Judge. This is not someone who's speculating. He was there. He knows that no records were kept. He knows that no criteria was met that required by law. He knows they double dipped. He knows that they're not allowed to double dip. Excuse me. Stop at stuff that he knows that no records were kept. Okay. You're referring to what kinds of records? The records that are required to be kept under those guidelines, including when the drug was used, who it was used, how much was used. What records should have been kept? The records are, I believe it's in paragraph 3435, which is the CDC requirements that there has to be a record of any vial that's going to be double dipped, that it was stored, how it was stored, how much was used, when it was used, when it was second dipped. So that any billing that occurred would have taken place in the absence of records that would have been necessary to justify the bill? Correct. Because without those records, how does the left hand, we're talking about how does my client on the right hand know what the left hand billing office is doing? Well, how does the left hand know what the right hand's doing if the right hand doesn't keep those records that are required by law? And it's a matter of law that it is inappropriate for them to double dip for the public safety unless they maintain these standards. And we've alleged, because my client has personal knowledge, that they don't. And I've read the complaint as recently as this morning, but what is the allegation, what do vermin or vermints refer to the lack of record keeping? I believe, Judge, it's paragraph, if 34 is the paragraph that lists the criteria, I think it goes on in 35, the next paragraph. So wherever we listed, it's either 34 and 35 or 35 and 36, I believe. And it says they did not adhere to any of these requirements, or to these requirements, I think is the word we use. But my client has personal knowledge of that. And it goes beyond speculation to say they didn't bill for this, because to think they didn't bill for this, it would mean that they're not in business to bill. They bill by the patient, which has to include the vial exemplar. And if exemplar is used, they have to bill for it. But anything in that bottle that's left over, and left over would include the overfill, and would also include the unused portion, because the vial is larger. By overfill, what do you mean? Some of these five micrograms have more than five micrograms in it? They all have more than what they're labeled, because when you take it with a needle, there's sometimes air, there's sometimes maybe some loss, there may be issues with putting it in. So the government intentionally pays for more than the label, because in every syringe situation, there's overfill. But overfill would not only be the small amount that's left in for the one dose. Overfill is really anything that is waste, which goes to my 12v6 argument, and I'm out of time, so I'm going to rely, unless Your Honor wants me to go into it, I'll rely on my brief. But waste, if it's not according to the safety is not maintained, then it's adulterated. And adulterated, they've certified that they do not do anything medically unnecessary. And the law is clear that if something's adulterated, the government's not going to pay for it. And they've adulterated any second use of these vials by not adhering to the guidelines. And we also believe this is a factual fraud, which is not a certification. Are there circumstances in which they can do that, in which they can use the excess? No. They cannot use the excess unless they adhere to those guidelines. Well, aren't there circumstances? I apologize. Yes, there are circumstances they don't apply in this case because they didn't adhere to those guidelines. And if they don't adhere, it's adulterated, they've certified on every Medicare claim form, and I have a much larger argument on 12v6, but my time is up. So I would then refer you to my brief and would rely on that for further argument, unless the Court has more questions for me. I don't want to take any more of your time. Speaking for myself, Mr. Begg and Mr. Mueller, really fine argument. I haven't seen either of you gentlemen before. I hope we get you back here. Very well done. I should tell your judge, and I think Mr. Mueller will agree with me, that we've litigated this case, and we are friends, and we met in the litigation, and it's been a pleasure to have this case with Mr. Mueller. That's also a nice thing. Hopefully neither one of you will do anything to the other that changes that. I don't think it's going to happen, Judge. Hopefully we won't do anything that changes that. We hope not. Well, hopefully, Judge. Thank you very much, gentlemen. Final matter is Sheldon v. Bledsoe.